CLERKS OFFICE U.S. DIST. COURT
AT LYNCHBURG, VA
FILED
11/13/2026
LAURA A. AUSTIN, CLERK
BY: s/ ARLENE LITTLE
DEPUTY CLERK

# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF VIRGINIA
LYNCHBURG DIVISION

DR. ERIC C. PARLETTE,

*Plaintiff*,

v.

DERMATOLOGY CONSULTANTS, INC., ET AL.,

*Defendants.*

CASE NO. 6:25-CV-00081

**MEMORANDUM OPINION**

JUDGE NORMAN K. MOON

In this employment discrimination case, Plaintiff Eric Parlette alleges that Dermatology Consultants, Inc. ("DCI"), along with Dr. Soni Carlton, Dr. Kappa Peddy, and Cavan Carlton (collectively, "Defendants"), discriminated against him on the basis of his military service in violation of the Uniformed Services Employment and Reemployment Rights Act, 38 U.S.C. § 4301 *et seq.* ("USERRA"). Now pending before the Court are the parties' cross-motions for summary judgment. Parlette moves for partial summary judgment on the threshold issue of his employment status with Dermatology Consultants, Inc. ("DCI"), seeking a determination that he was an employee of DCI. Dkts. 29, 30. Defendants move for a finding that Parlette was an independent contractor, precluding his right to relief under USERRA. Dkts. 31, 32.

At a hearing held on these motions on November 6, 2026, the undersigned stated his belief that whether Parlette was an independent contractor or an employee is a jury issue, and that he was inclined to deny both parties' motions on that basis. Upon further consideration of the parties' arguments, including authorities raised at the hearing by both parties, the Court agrees with the parties that Parlette's employment status raises a question of law that should be decided now. For the reasons that follow, Defendants' motion for summary judgment will be granted. Plaintiff's

motion for partial summary judgment will be denied.

## LEGAL STANDARD

A motion for summary judgment must be granted when there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the burden of establishing that summary judgment is warranted. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). If the moving party meets this burden, the nonmoving party must set forth specific, admissible facts to demonstrate a genuine issue of fact for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The non-movant may not rest on allegations in the pleadings; rather, he must present sufficient evidence such that a reasonable fact finder could find by a preponderance of the evidence for the non-movant. *See Celotex*, 477 U.S. at 322–24.

On cross-motions for summary judgment, a court must "consider each motion separately on its own merits to determine whether either of the parties merit judgment as a matter of law." *Defs. of Wildlife v. N.C. DOT*, 762 F.3d 374, 392 (4th Cir. 2014). A court deciding summary judgment must view the record in the light most favorable to the non-moving party. *See Terry's Floor Fashions, Inc. v. Burlington Indus.*, 763 F.2d 604, 610 (4th Cir. 1985). But summary judgment is appropriate if "the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

"USERRA does not provide protections for an independent contractor." 20 C.F.R. § 1002.44(a). Thus, a threshold question in this case is whether Plaintiff was an employee protected by USERRA or an independent contractor who was not. USERRA defines an "employee" as "any person employed by an employer." 38 U.S.C. § 4303(3). Given that definition's circular nature,

and because Congress intended that USERRA would define "employee" in the same manner as under the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.* ("FLSA"), courts hearing USERRA cases apply the same "economic realities" test used to determine employment status under the FLSA. *See Murphy v. Tuality Healthcare*, 157 F. Supp. 3d 921, 925 (D. Or. 2016) (citing *Evans v. MassMutual Fin. Grp.*, 856 F. Supp. 2d 606, 609 (W.D.N.Y. 2012) ("Though the case law on this issue in the USERRA context is sparse, cases interpreting analogous provisions in the Fair Labor Standards Act . . . are relevant in this regard.")). That test considers the following factors:

1. The extent of the employer's right to control the manner in which the individual's work is performed;
2. The opportunity for profit or loss that depends upon the individual's managerial skill;
3. Any investment in equipment or materials required for the individual's tasks, or his or her employment of helpers;
4. Whether the service the individual performs requires a special skill;
5. The degree of permanence of the individual's working relationship; and
6. Whether the service the individual performs is an integral part of the employer's business.

*See Chavez-Deremer v. Med. Staffing of Am., LLC*, 147 F.4th 371, 384 (4th Cir. 2025); *accord* 20 C.F.R. § 1002.44(b). No factor is determinative, and all are relevant to the individual's status as an employee or independent contractor. *See* 20 C.F.R. § 1002.44(c).

"The touchstone of the economic realities test is whether the worker is economically dependent on the business to which he renders service or is, as a matter of economic reality, in business for himself." *McFeeley v. Jackson St. Ent., LLC*, 825 F.3d 235, 241 (4th Cir. 2016) (citation modified). The test is designed to allow for flexible application to "the myriad different working relationships that exist in the national economy." *Id.* "In other words, the court must adapt its analysis to the particular working relationship, the particular workplace, and the particular

industry" in each case. *Id.*

## BACKGROUND

Dr. Eric Parlette is a Mohs surgeon based in Virginia.[1] DCI is a dermatology practice located in Lynchburg, Virginia. Between January 2021 and March 2024, Parlette was paid by DCI to perform Mohs surgeries in Lynchburg. *See* Dkt. 32-5 at 222:13–223:5. During that time, DCI was owned by Dr. Soni Carlton ("Soni") and Dr. Kappa Peddy ("Peddy"). *See* Dkt. 32-1 at 26:9–20, 169:25–170:10; Dkt. 32-2 at 17:16–24. Cavan Carlton ("Cavan"), Soni's husband, provided executive level financial analysis and management for DCI as an independent contractor. *See* Dkt. 30-11 at 13:8–14, 35:12–15. Cavan's responsibilities included recruiting physicians, such as Parlette, and the management of DCI's finances, including payments to Parlette.

DCI has not always provided Mohs surgery services for its patients. But recognizing that the Lynchburg area lacked Mohs surgery services, which resulted in DCI referring their patients requiring Mohs surgery to providers outside the Lynchburg area, DCI first hired a Mohs surgeon in 2011. *See* Dkt. 32-4 at 31:17–32:20; Dkt. 32-1 at 169:25–170:17. DCI did not consistently provide Mohs surgery services between 2011 and 2021, when Parlette was hired. *See* Dkt. 32-4 at 30:17–22; Dkt. 32-2 at 43:12–18. Rather, DCI occasionally worked with Mohs surgeons to provide their services on an inconsistent basis. *Id.*

Parlette provided surgical services for DCI under the terms of an agreement drafted by Cavan in January 2021. *See* Dkt. 30-11 at 80:11–22, 81:5–11, 85:5–8.[2] The agreement was titled

---

[1] Mohs surgery is an outpatient procedure performed under local anesthesia that is used to treat skin cancer. *See* Dkt. 30 at 2 n.1 (citing Mohs Surgery and Dermatologic Surgery, https://med.virginia.edu/dermatology/patient-information/mohs-surgery-dermatologic-surgery/ (last visited Sep. 27, 2026)).

[2] Although Parlette objected to the paragraphs in Defendants' briefing that referenced this agreement, Parlette's objection appears to be limited to Defendants' assertion that it was an undisputed fact that Parlette "was an independent contractor and not an employee." Dkt. 34 at 6.

"Independent Locum Tenens Agreement", provided that Parlette "understands that he is an independent contractor and is not an employee of DCI," and was signed by Parlette, Soni, and Peddy. *See* Dkt. 35-5, Ex. 11; Dkt. 30-11 at 80:11–22, 81:5–11, 85:5–8. It contained no set duration, no renewal terms, and no termination provision to be followed by the parties. *See* Dkt. 35-5 at 222:13–223:5, Ex. 11. Although the parties discussed modifying the terms of that agreement in December 2021, to take effect in 2022, no additional agreement was ever signed. *See* Dkt. 25-5, Exs. 10–13; Dkt. 32-4 at 79:17–80:10. In Parlette's proposed agreement for 2022, he still classified himself as an independent contractor. *See* Dkt. 32-5 at 226:15–228:5, Ex. 13.

Defendants' characterization of Parlette as an independent contractor was not entirely uniform. Soni reported on a U.S. Navy credentialing form that she was Parlette's "employer." Dkt. 30-12 at 60:3–8. And in a cover letter to that credentialing form, Kelly Kraft-Meyer, DCI's Executive Practice Administrator, wrote that Parlette was "a dermatologist and Mohs Surgeon in good standing in our practice." *See* Dkt. 30-10 at 76:7–77:5. 80:1–81:1; *see also* Dkt. 30-10 at 7:10–21.

Defendants' employment classifications of its physicians and Mohs surgeons was also not uniform. When Parlette received a tax Form 1099 in 2024, he was the only physician to be classified by DCI as an independent contractor instead of an employee. *See* Dkt. 30-10 at 32:14–17, 23–25. Some Mohs surgeons previously hired by DCI, such as Dr. Jason Givan, were classified by DCI as employees. *See* Dkt. 30-11 at 52:11–18. 53:1–11; Dkt. 30-12 at 49:18–50:13. Others, including Dr. Shields Callahan, Dr. Raj Varma, Dr. Kiyanna Williams, and Dr. Rechelle Tull, were classified as independent contractors. *See* Dkt. 30-11 at 60:2–63:11.[3] These independent

---

Parlette does not raise any genuine dispute about the authenticity or contents of the agreement itself.

[3] One doctor, Alisa Funke, was classified as an employee for one stint in her relationship with DCI, and as an independent contractor during another. *See* Dkt. 25-4 at 52:4–53:11, 59:21–

contractors worked with DCI for between two weeks and six months. *Id.*[4]

Per the parties' agreement, Parlette was compensated for his surgeries by receiving a flat rate of $2,500 per day that he completed surgeries, a per diem for meals, and payment of his lodging expenses. *See* Dkt. 32-5 at 220:14–222:8. These amounts were generally paid to Parlette by physical check the week after he completed the surgeries. *See* Dkt. 32-5 at 220:14–22, 223:13–225:11. DCI also paid Parlette fifty percent of collections received from his services, minus the amount already paid for the daily flat rate, on a monthly basis. *See* Dkt. 32-5 at 220:14–22, 223:13–225:11. The fees DCI collected for the Mohs procedures performed by Parlette were set by Medicare and private insurance companies. *See* Dkt. 32-1 at 101:22–103:19; Dkt. 32-3 at 65:5–9; Dkt. 32-4 at 93:2–8.

This arrangement was followed for the entire time that Parlette provided surgical services to DCI. *See* Dkt. 32-5 at 223:13–224:4. During that time, Parlette's surgeries generated approximately $1,400,000 of revenue each year. *See* Dkt. 30-11 at 146:1–4, 148:5–12. Fifty percent of that (around $700,000 per year) was paid to Dr. Parlette per the terms of his agreement. *See* Dkt. 25-4 at 145:12–147:14. DCI paid its other expenses out of the remainder of its share of the revenue. *Id.*

Parlette decided the weeks in which he would perform Mohs surgeries at DCI, and would inform DCI staff of his availability. *See* Dkt. 32-5 at 103:4–104:18; Dkt. 32-7 at 78:19–80:5. Parlette did not have to get permission or approval from Soni, Peddy, or anyone else at DCI for periods that he did not work. *See* Dkt. 32-5 at 103:4–104:18; Dkt. 32-1 at 124:4–125:17, 249:3–63:23.

---

[4] At least some of these independent contractors tended to work one or two days a week during their time with DCI. *See* Dkt. 30-11 at 60:2–63:11. Parlette worked an average of about two-and-a-half days per week throughout his relationship with DCI. *See* Dkt. 30-11 at 119:9–120:15.

12. Thus, although when Parlette first began performing Mohs surgeries at DCI, he worked the schedule of the prior Mohs surgeon, he shortly thereafter changed his schedule from the four days a week worked by the prior surgeon to three days a week. *See* Dkt. 32-5 at 103:22–104:18; Dkt. 32-7 at 72:12–73:4.

While providing Mohs surgical services to DCI, Parlette was also providing Mohs surgical services to Metro Mohs, a Mohs surgery practice in Northern Virginia. *See* Dkt. 32-5 at 97:13–98:2. He was also working as an independent contractor for Castle BioSciences, a company providing gene expression profiling services in connection with cancer treatment. *Id.* at 120:19–121:7. He engaged with others to launch Applied IQ, a leadership and ethics consulting business of which he was an owner. *Id.* at 148:9–149:14. And he provided general dermatology telehealth medical services as an independent contractor for SkyMD. *Id.* at 179:4–180:13. Parlette never asked for nor was he required to obtain DCI's approval to work for any of these entities. *Id.* at 135:7–136:13.

Per the terms of its agreement with Parlette, DCI provided malpractice insurance coverage for him. *See* Dkt. 32-4 at 94:19–95:4.[5] Because DCI classified Parlette as an independent contractor, DCI's medical malpractice insurance carrier required that DCI obtain a separate policy for Dr. Parlette. *See* Dkt. 32-4 at 94:19–95:4.[6] DCI did so. DCI carried solo medical-malpractice coverage for Parlette. *See* Dkt. 30-11 at 94:13–95:4; Dkt. 30-12 at 161:2–7. To cover the surgery services he was providing for Metro Mohs, Parlette asked DCI if Metro Mohs could be added to

---

[5] As in note 2, *supra*, Parlette does not raise any genuine dispute of material fact as to the assertion that DCI's agreement with Parlette provided for DCI to provide insurance for him. *See* Dkt. 34 at 6–11.

[6] *See* note 2, *supra*. Parlette does not raise any genuine dispute of material fact as to the assertion that DCI's insurance carrier forbade them from adding Parlette to their general insurance plan because DCI classified Parlette as an independent contractor. *See* Dkt. 34 at 6–11.

the insurance policy provided for him by DCI. *See* Dkt. 32-5 at 219:7–220:10. DCI agreed. *Id.*

Parlette performed surgeries at office space leased by DCI. *See* Dkt. 30-10 at 58:21–25, 59:1. DCI provided most of the tools required for Mohs surgeries, including cryostats, stainers, microscopes, exam chairs, and surgical lights. *See* Dkt. 30-11 at 95:8–15, Dkt. 30-12 at 49:6–50:23. Some of these tools, such as cryostats, are too heavy for a surgeon to carry around with them. *See, e.g.,* Dkt. 30-13 at 79:21–25. Thus, "[i]f you're going to provide services to a practice as a Mohs surgeon, the practice has to have that machine." Dkt. 30-13 at 79:21–25. Dr. Parlette used his own laptop in connection with the services provided to DCI. *See* Dkt. 32-1 at 113:3–10; Dkt. 32-4 at 95:10–23.

DCI also employed staff members to assist Parlette in performing Moh's surgeries. *See, e.g.,* Dkt. 30-13 at 91:12–24; 92:2–8. Parlette was included on DCI's appointment cards and its office directory, and he had his own phone extension and nameplate on the Mohs department office. *See* Dkt. 30-10 at 69:5–70:16. He was included on DCI's website. Dkt. 30-10 at 42:19–24. DCI billed Parlette's patients, see Dkt. 30-10 at 59:2–25, and payer contracts were held by DCI, *see* Dkt. 30-11 at 92:10–19.

The majority of Parlette's patients were referred to him by DCI's general dermatology practice. Between "95" and "98 percent of all surgeries [Parlette] performed were from patients that had seen one of [DCI's] general dermatology providers." Dkt. 30-11 at 91:19–92:9. DCI schedulers booked patients into appointment slots based on Parlette's availability. *See* Dkt. 30-11 at 117:10–20, 118:1–3. But Parlette could and did decline to accept some referrals, including when they required "a very delicate and complicated surgery." *See* Dkt. 34-3 at 115:10–116:2–6.

Parlette also exercised oversight over the number of patients DCI schedulers would schedule per day. For instance, in January 2024, Soni instructed DCI schedulers that Parlette

should see ten patients per day when he was in the clinic. *See* Dkt. 30-11 at 104:18–105:5. Cavan described that instruction as a directive. *See* Dkt. 30-11 at 108:9–22. Parlette did not agree to see ten patients per day. Instead, Parlette wrote to Soni:

> Thank you so much for supporting us and continuing to have confidence in our ability to perform high volume Mohs surgery. We will always strive to maximize our efficiency to optimize our productivity. However, high quality of care will always continue to be our number one priority. Given our current staffing, and relative overall skill and competency of our current team, sustaining high Mohs volume may be challenging. That being said, ten cases per day is a great goal to strive for, like when we had a very experienced and skilled team. We are not there yet. We will continue to schedule accordingly to prioritize the quality of care, taking into consideration the complexity of the cases and the capabilities of the staff. We will continue to schedule what is safe and appropriate to maintain high quality.

Dkt. 35-5 at 278:6–281:3, Ex. 20. This was not the first time Parlette had informed DCI that he was going to adjust the surgery schedule that DCI had asked him to perform. Previously, in May 2023, Parlette emailed Cavan for his "situational awareness," advising that "we're not going to be able to safely or effectively care for the volume that is currently scheduled. We are going to scrub our schedule and move less urgent cases . . . to a later date . . . . We are also going to offer the opportunity to go outside the practice to Dr. Givan, Dr. Funke, Carilion in Roanoke, or UVA." *See* Dkt. 35-5 at 281:19–283:5, Ex. 21.

The relationship between Parlette and DCI terminated on March 31, 2024. *See* Dkt. 34-19, Ex. 21.[7] In July 2024, DCI closed its Mohs department for several reasons, including that Dr. Rechelle Tull terminated her contract with DCI and that Mohs surgical services were not covering the expenses associated with providing such services. *See* Dkt. 32-4 at 28:3–30:16; Dkt.

---

[7] The reasons for that termination are disputed but not relevant to the issue of Parlette's employment status. In sum, Parlette alleges that he was terminated because of his military commitments in violation of USERRA. *See, e.g.,* Dkt. 34 at 19–25. Defendants argue that he was lawfully terminated because he was reprimanded by the Virginia Board of Medicine Board for an inappropriate relationship with a patient. *See, e.g.,* Dkt. 32 at 1–2.

32-1 at 108:22–109:23. Although DCI has shut down its Mohs department, it has retained its general dermatology patients. *See* Dkt. 30-11 at 47:18–25, 48:1–16. DCI now refers Mohs patients elsewhere. *Id.*

## Discussion

The parties agree that determination of Parlette's employment status is a question of law that is appropriate for decision at summary judgment. *See* Dkt. 30 at 5 (citing *McFeeley v. Jackson St. Entm't. LLC*, 825 F.3d 235, 241 (4th Cir. 2016)); Dkt. 32 at 14. They also agree that the six-factor "economic realities" test is the appropriate standard, and that the undisputed facts of this case are sufficient to decide the issue under that standard.[8] *See* Dkts. 30, 32 (applying the test). The Court will consider each factor in turn.

### A. The Employer's Right to Control

The first factor is the degree of control that the alleged employer has "over the manner in which the work is performed." *Schultz v. Capital Intern. Sec., Inc.*, 466 F.3d 298, 305, 307 (4th Cir. 2006). A "lack of supervision over minor regular tasks cannot be bootstrapped into an appearance of real independence." *Chavez-Deremer v. Med. Staffing of Am., LLC,* 147 F.4th 371, 400 (4th Cir. 2025). The key question is "whether the worker has control over such a meaningful portion of his labor that he operates as a separate economic entity." *Id.*

Parlette had significant control over the manner in which his surgeries were performed. He told DCI when he was available to work, and DCI scheduled his surgeries accordingly. *See* Dkt.

---

[8] Although Parlette signed an agreement labeling him an independent contractor, the label used by the parties is not dispositive of the nature of a working relationship under the economic realities test. *See Foster v. Gold & Silver Private Club, Inc.*, 2015 WL 8489998, at *5 (W.D. Va. Dec. 9, 2015) (collecting cases). If anything, it is evidence of the relationship the parties thought they had. But the label *qua* the label is not evidence of the economic realities that are determinative here. The Court therefore considers the economic realities of the relationship (including the undisputed terms of the agreement) rather than the labels the parties applied.

32-5 at 103:4–104:18; Dkt. 32-7 at 78:19–80:5. DCI could not control when his surgeries were performed. *See* Dkt. 32-5 at 103:4–104:18; Dkt. 32-1 at 124:4–125:17, 249:3–12. They also could not control how his surgeries were performed. Parlette maintained control over the medical judgement he exercised as a surgeon. *See, e.g.,* Dkt. 34 at 18. And when these two issues—when and how his surgeries were performed—converged after Soni asked DCI schedulers to schedule more Mohs surgeries per day than Parlette thought appropriate, Parlette exercised his control over the Mohs practice to veto Soni's directive. *See* Dkt. 35-5 at 278:6–281:3, Ex. 20.

Parlette also had significant control over who he performed surgeries on. Although the vast majority of his patients were referred by DCI's general dermatology practice, Parlette retained discretion to decline referrals and to refer patients to other providers. *See* Dkt. 35-5 at 281:19–283:5, Ex. 21. DCI could not force Parlette to treat a patient.

Parlette stands in contrast with the anesthesiologist in *Murphy v. Tuality Healthcare*, 157 F. Supp. 3d 921, 926 (D. Or. 2016), that he seeks to compare himself to. *See, e.g.*, Dkt. 34 at 17 (citing *Murphy*). In that case, Dr. Murphy "had to accommodate the surgeon's preferences when providing anesthesia services" and "was required to respond to the directives of Tuality's Medical Director." *Murphy*, 157 F. Supp. 3d at 926. Tuality "exercised a great deal of control over Murphy's work schedule," requiring him "to work full-time at the Hospital for at least 42 weeks per year according to the schedule set by" their staff. *Id.* "Murphy also had to receive permission from [hospital management] to adjust Murphy's schedule." *Id.* As detailed above, Parlette's situation differs from *Murphy* at every step.[9] The control factor weighs in favor of Defendants.

---

[9] Although Parlette argues that DCI controlled where Parlette performed the surgeries by providing the clinic space for Parlette, *see* Dkt. 30 at 19, that argument overlooks that Parlette also performed surgeries at and for another clinic, Metro Mohs, in northern Virginia. Unlike the plaintiff in *Murphy*, Parlette did not need to get permission from DCI to practice his trade elsewhere. *Cf.* 157 F. Supp. 3d at 928. DCI did not and could not prevent Parlette from providing surgeries at Metro Mohs, and even added Metro Mohs to the solo practitioner insurance it took out

**B. The Individual's Opportunity for Profit or Loss & Relative Investment in Equipment, Materials, and Staff**

Although these two factors are typically listed separately, courts will sometimes consider them together because "the relevance of these two factors is intuitive." *McFeeley*, 824 F.3d at 243. "The more the worker's earnings depend on his own managerial capacity rather than the company's, and the more he is personally invested in the capital and labor of the enterprise, the less the worker is 'economically dependent on the business' and the more he is 'in business for himself' and hence an independent contractor." *Id.* (quoting *Schultz*, 466 F.3d at 305).

Parlette's earnings depended on the number of days he worked and the total collections DCI received as a result of his efforts. *See* Dkt. 32-5 at 220:14–22, 223:13–225:11. Although Parlette exercised meaningful managerial discretion over the number of surgeries he performed—and thus his opportunity for profit or loss—those opportunities depended at least to some extent more on Defendants' management and decision-making than his own. The vast majority of his patients were referred to him by DCI. And Defendants' investment in the DCI Mohs department, including office space, equipment and staffing, far exceeded Parlette's. But "neither of these two elements should be overstated." *McFeeley* at 244.

> Those who engage independent contractors are often themselves companies or small businesses with employees of their own. Therefore, they have most likely invested in the labor and capital necessary to operate the business, taken on overhead costs, and exercised their managerial skill in ways that affect the opportunities for profit of their workers. Those fundamental components of running a company, however, hardly render anyone with whom the company transacts business an "employee" under the FLSA. The focus, as suggested by the wording of these two factors, should remain on the worker's contribution to managerial decision-making and investment <u>relative</u> to the company's.

*Id.* (emphasis in original).

---

for Parlette at his request. Thus, the use of DCI's clinic space is more helpful to Plaintiff under the investment factor, *infra*, than under the control factor.

In view of this particular working relationship, and this particular workplace, Parlette exercised managerial decision-making over the Mohs practice's profitability that was comparable to DCI's. Where pricing was set by insurance companies, the primary lever of profitability was the number of patients treated. And when DCI attempted to pull that lever, and schedule more patients per day than Parlette was comfortable with, he effectively vetoed that decision, indicating that quality of care was more important to him (and his business) than sheer numbers. *See* Dkt. 35-5 at 278:6–281:3, Ex. 20. Even viewing the facts in the light most favorable to Parlette, nothing in the record indicates that DCI was able to force Parlette to treat more patients (and make more money for himself and DCI, at least in the short term) than he wanted to.

In view of this particular industry, DCI's investment in Mohs equipment and staffing does not tilt the scales in favor of an employment relationship. DCI concedes that this factor favors Parlette, and indeed it does. But if a surgeon had to carry around every large and unwieldy machine required to do his job in order to be an independent contractor, it is unlikely that any surgeon ever could be an independent contractor. *See, e.g.,* Dkt. 30-13 at 79:21–25 ("If you're going to provide services to a practice as a Mohs surgeon, the practice has to have" a cryostat machine). The economic realities test is not so rigid. *See McFeeley* at 244. On these facts, DCI's investment in the Mohs practice does not outweigh the other factors indicating that Parlette was an independent contractor.

**C. The Individual's Special Skill**

The parties do not dispute that Mohs surgery requires a special skill. *See* Dkt. 30 at 22; Dkt. 32 at 16. But the mere fact that an individual has special skills does not necessarily indicate that they are an independent contractor. *See Murphy*, 147 F. Supp. 3d at 927. Rather, courts also look to whether a person's special skills are used in an independent manner. *See, e.g., Chavez-*

*Deremer*, 147 F.4th at 407 (citing *Brock v. Superior Care, Inc.*, 840 F.2d 1054, 1060 (2d Cir. 1988)); *Baker v. Flint Eng'g & Constr. Co.*, 137 F.3d 1436, 1443 (10th Cir. 1998) (finding that although plaintiff welders were highly skilled and were not told by defendant how to complete a particular weld, they were told by the defendant where and when to weld, and thus did not exercise their skills in an independent manner). Here Parlette practiced his skills in an independent manner. DCI could not tell Parlette when, how, and for whom he would use his unique talents. Indeed, Parlette practiced his skills at another Mohs clinic concurrently. *See* Dkt. 32-5 at 97:13–98:2. This factor weighs in favor of Defendants.

**D. The Degree of Permanence of the Working Relationship**

"The more permanent the relationship, the more likely the worker is to be an employee." *Schultz*, 466 F.3d at 309. Although an "indefinite" relationship "weighs in favor of the worker being an employee," 20 C.F.R. § 795.110(b)(3), [10] an "at-will arrangement that could be terminated by either party at any time" "could characterize either an employee or an independent contractor depending on the circumstances of the working relationship." *McFeeley* at 244. Parlette did work for DCI for more than three years. But the parties agree that during that time, either party could have terminated the relationship at any time. *See* Dkt. 30 at 23–24; Dkt. 32 at 17. Accordingly, this factor is neutral.

**E. Whether the Individual's Service is Integral to the Employer's Business**

The final factor is the extent to which the service rendered by the worker is an "integral part" of the putative employer's business. *See Schultz*, 466 F.3d at 309. On this record, Moh's

[10] 20 C.F.R. § 795.110(b)(3) provides that this factor weighs in favor of employment "when the work relationship is indefinite in duration, continuous, or exclusive of work for other employers." That Parlette's work relationship was not exclusive, and Parlette plied his trade elsewhere for the duration of his relationship with DCI, undercuts the strength of his reliance on this regulation.

surgery cannot be said to be "integral" to DCI's business. The undisputed facts indicate that the core of DCI's business is general dermatology. Unlike the anesthesiologist in *Murphy*, whose services were required for hospital surgeons to be able to operate their own core business, Parlette's services had no bearing on the ability of DCI to practice general dermatology. *Cf.* 157 F. Supp. 3d at 926. DCI practiced general dermatology for many years before it had a Mohs practice, and it has continued practicing general dermatology since closing the Mohs practice. *See, e.g.,* Dkt. 32-4 at 31:17–32:20, 43:12–18; Dkt. 32-1 at 169:25–170:17.

Mohs surgery is a specialist procedure. *See, e.g.*, Dkt. 30 at 22 ("Mohs surgery plainly requires specialized medical skill."). Parlette points to DCI's advertising of Mohs services, but merely advertising a specialist service does not make that service an integral part of a general practice. Likewise, although Parlette points to the gross revenue the Mohs practice generated, that number alone—without context for expenses, net revenue, or comparative revenue from the general practice—does not establish an "integral" part of a business. And in any event, the fact that DCI decided to close the Mohs practice shortly after Parlette's departure, in part because the practice was not covering its own expenses, undercuts any reliance on revenue. *See* Dkt. 32-4 at 28:3–30:16; Dkt. 32-1 at 108:22–109:23.

In Plaintiff's memorandum in support of his motion for summary judgment, he frames the issue of whether he exercised professional judgment in the following way: "the inquiry is not whether Dr. Parlette was in charge of his medical decisions," but "whether Dr. Parlette controlled a meaningful independent economic enterprise." Dkt. 30 at 20 (citing *Chavez-DeRemer*, 147 F.4th at 407). That framing is also useful here, and the fact that DCI was able to sever the Mohs practice after Parlette's departure and continue to operate unabated indicates that Parlette did indeed operate a meaningfully independent enterprise—one that was not integral to DCI's business. *See*

Dkt. 30-11 at 47:18–25, 48:1–16. This factor favors Defendants.

## CONCLUSION

"[T]he employee/independent contractor distinction is not a bright line but a spectrum." *McFeeley*, 825 F.3d at 241. A court must therefore weigh the six factors "with an eye towards the ultimate question: whether, against the backdrop of the particular working relationship, the particular workplace, and the particular industry," the underlying economic realities lead to the conclusion that the worker is "economically dependent on the business to which he renders service or is, as a matter of economic reality, in business for himself." *See Chavez-Deremer*, 147 F.4th at 397; *McFeeley* at 241.

The totality of the circumstances of this case lead to the conclusion that Parlette was in business for himself. Even in the posture of Defendant's motion, where the Court must view the facts in the light most favorable to Parlette, the Court "cannot accept [Plaintiff's] contrary characterization, which cherry-picks a few facts that supposedly tilt in [his] favor and downplays the weightier and more numerous factors indicative of" an independent contractor relationship. *McFeeley* at 241. Parlette relies heavily on DCI's investments in space, equipment, and staffing for the Mohs practice. But in view of this particular working relationship, DCI's investments in the "fundamental components" of running a Mohs practice do not overcome Parlette's control, managerial discretion, and use of special skill in this non-integral part of DCI's business. *Cf. McFeeley* at 244.

Plaintiff has not demonstrated any genuine issue of material fact for trial. Because Parlette was an independent contractor, he is not entitled to relief under USERRA, and Defendants are entitled to judgment as a matter of law. Defendants' motion for summary judgment will be granted. Plaintiff's motion for partial summary judgment will be denied.

A separate order will issue. The Clerk of Court is directed to send a copy of this Memorandum Opinion to all counsel of record.

It is **SO ORDERED**.

Entered this 13th day of November, 2026.

NORMAN K. MOON
SENIOR UNITED STATES DISTRICT JUDGE